**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 05-759-PHX-EHC |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| | ) | |
| Denys Hughes, | ) | |
| Defendant. | ) | |
| | ) | |

Pending before the Court is Defendant's Motion to Suppress Evidence [dkt. 19] and Motion to Sever Counts [dkt. 37]. The Motions are fully briefed. On April 27 and 28, 2006, the Court held an evidentiary hearing on the Motion to Suppress Evidence.

**Background**

At approximately 11:00 p.m. on July 7, 2005, Undersheriff Max Barrett of the Russell County, Kansas Sheriff's Department saw Defendant cross the centerline three times while driving on Highway 281, a rural highway. Defendant was driving a rented car from Phoenix, Arizona to Manitowish Waters, Wisconsin, where he had a residence and planned to stay. Undersheriff Barrett activated his lights, but Defendant did not pull over to the side of the road for at least a mile.

Once he pulled over, Defendant said that he was tired from driving all day and asked directions to the interstate. Undersheriff Barrett observed that the car "was packed full of stuff that was covered with blankets." [Dkt. 61, p. 73]. He observed further that the

1    windows of the car were all rolled down about four inches. Undersheriff Barrett asked for

2    Defendant's license and other paperwork. While retrieving the papers, Defendant moved

3    the blanket covering the items in the front seat, revealing a cooler.

4        While Undersheriff Barrett reviewed the paperwork in his vehicle, Russell County

5    Sheriff's Deputy William Dollison arrived on the scene as a courtesy to aid Undersheriff

6    Barrett. Deputy Dollison's car was equipped with a camera and he wore a microphone;

7    those devices recorded some of the stop and subsequent search. After checking the

8    papers, Undersheriff Barrett returned them to Defendant and told him was free to go.

9        Undersheriff Barrett walked to the back of Defendant's car, turned and reapproached

10   the driver's window of the car, and asked Defendant is he was willing to answer a few

11   questions. Defendant agreed to answer questions and eventually to a search of his car.

12   Defendant was outside the car with Deputy Dollison during the search. The search of the

13   car revealed that Defendant had a loaded pistol between the passenger's seat and the

14   center console, rifles and handguns in the trunk, books on making bombs and poisons, jars

15   of unknown chemicals, crushed fuses, military primers, and fertilizer. Undersheriff Barrett

16   found notes in the car related to purchasing cannon fuse, carrying concealed weapons,

17   and building a reinforced bunker. The officers did not arrest Defendant or seize any items.

18   Defendant left after the search.

19       On July 11, 2005, Undersheriff Barrett contacted the local agent for the Department

20   of Homeland Security, who told Undersheriff Barrett that an agent from the Bureau of

21   Alcohol, Tobacco and Firearms (ATF) would contact him.

22       On July 12, 2005, ATF and local law enforcement agents executed a state search

23   warrant on Defendant's house in Manitowish Waters, Wisconsin. In the house, the agents

24   found 43 guns and 3500 castor beans, which can be milled to make the poison ricin.

25       During the search, Defendant was handcuffed inside a police van with a local officer

26   and ATF Agent Jason Salerno for questioning. After initially declining, Defendant signed

27   a form to give consent to a search of his apartment in Phoenix. Deputy Chris Petreikis and

28

1   Lieutenant Gary Peske of the Vilas County Sheriff's Office took Defendant to the Vilas

2   County Jail, 45 miles away. Neither officer knew that Defendant had consented to the

3   search of his apartment in Phoenix. During the drive, Defendant "stated that he wished he

4   would have withdrawn his permission." [Dkt. 61, p. 14]. At the jail, Defendant told

5   Lieutenant Peske "I think I would like to withdraw my permission to search my place." [Dkt.

6   61, p. 43].

7           On the morning of July 13, 2005, Lieutenant Peske reported Defendant's statements

8   to Special Agent Rodney Pevytoe of the Wisconsin Department of Criminal Investigation.

9   Later that morning, Defendant's statements were reported to Agent Salerno. In turn, Agent

10  Salerno contacted ATF Agent Tristan Moreland, who was leading the search of

11  Defendant's Phoenix apartment. By the time Agent Salerno contacted him, Agent Salerno

12  had already searched Defendant's Phoenix apartment.

13          The search of the Phoenix apartment was interrupted for safety reasons when Agent

14  Moreland found castor beans next to a pestle and mortar and a Petri dish with something

15  growing inside. The officers conducting the search evacuated the surrounding apartments

16  until the apartment could be checked for hazardous materials. In the meantime, Agent

17  Moreland heard from Agent Salerno concerning Defendant's statements. Agent Moreland

18  began to write an affidavit for a search warrant to continue the search of the Phoenix

19  apartment. The affidavit informed the Magistrate Judge that Defendant had attempted to

20  withdraw his consent. The search warrant was issued and the search resumed.

21          On November 8, 2005, Defendant's Wisconsin home was searched again.

22  **Motion to Suppress Evidence**

23          Defendant challenges the stop and search of his car and argues he revoked his

24  consent to the first search of his Phoenix apartment. Defendant also argues that evidence

25  seized during the two searches of his house in Wisconsin and the second search of his

26  apartment in Arizona must be excluded as the fruit of the search of his car and the first

27  search of his Phoenix apartment.

28

### A.    Stop and Search of the Car

The traffic stop in this case was initiated for crossing the centerline of state highway U-281, in violation of K.S.A. § 8-1514. The Ninth Circuit has held "that if the officers have probable cause to believe that a traffic violation occurred, the officers may conduct a traffic stop even if the stop serves some other purpose." United States v. Willis, 431 F.3d 709, 715 (9th Cir. 2005). The Ninth Circuit has further recognized that crossing the lane markers of a roadway in violation of a statute can form the basis of a proper traffic stop. United States v. Perez, 37 F.3d 510, 513 (9th Cir. 1994) (proper traffic stop where officers observed "van pass them and weave back and forth across the fog line"); cf. United States v. Colin, 314 F.3d 439, 444 (9th Cir. 2002) (touching, but not crossing, lane marker did not provide basis for traffic stop). Undersheriff Barrett saw Defendant's car cross the center line three times, an act prohibited in Kansas. The traffic stop was proper.

During the traffic stop, Undersheriff Barrett asked Defendant "if he had any drugs or alcohol, firearms or large amounts of cash, [or] any kind of contraband in the vehicle." [Dkt. 61, p. 79]. "Questions asked during an investigative stop must be reasonably related in scope to the justification for their initiation. An officer may, however, broaden the line of questioning if there are additional particularized and objective factors arousing suspicion." United States v. Garcia-Rivera, 353 F.3d 788, 791 (9th Cir. 2003).

Undersheriff Barrett saw Defendant cross the centerline three times while driving a car with Arizona license plates late at night on a rural Wisconsin highway. Cf. United States v. Diaz-Juarez, 299 F.3d 1138, 1142-43 (9th Cir. 2002) (reasonable suspicion to investigate for drug smuggling where officer observed vehicle registered out of the area driving erratically late at night in an area known for smuggling). Defendant continued to drive at least a mile after Undersheriff Barrett activated his lights. See Haynie v. County of L.A., 339 F.3d 1071, 1076 ("suspicion was heightened by the fact that [the driver] failed to immediately yield to either [officer's] lights or sirens"). Once Defendant was stopped, Undersheriff Barrett found Defendant to be nervous. Undersheriff Barrett noticed that

1  Defendant's car "was packed full of stuff that was covered with blankets" [Dkt. 62, p. 73]
2  and there was a cooler on the passenger seat. The windows of the car where rolled down
3  approximately four inches, an arrangement Undersheriff Barrett testified narcotics
4  traffickers use to keep odors from building up in a car. [Dkt. 62, p. 73]. Defendant's
5  paperwork indicated that the car was rented. Given the combination of factors, Undersheriff
6  Barrett justifiably expanded the scope of the investigation to determine whether Defendant
7  was transporting contraband.

8       Having found that the stop and subsequent investigation were proper, the Court
9  considers whether Defendant voluntarily consented to the search of his car. Whether
10 consent is freely given is based on the totality of the circumstances. U.S. v. Cormier, 220
11 F.3d 1103, 1112 (9th Cir. 2000) (setting forth factors to consider in determining whether
12 consent was freely given). In reviewing a voluntariness finding, the Ninth Circuit looks at
13 whether officers had drawn their guns and whether the defendant was in custody, given
14 the warnings articulated in Miranda v. Arizona, 384 U.S. 436 (1966), told that a search
15 warrant could be obtained, and told that he could refuse to consent. Cormier, 220 F.3d at
16 1112. "These factors are only guideposts, not a mechanized formula to resolve the
17 voluntariness inquiry." United States v. Rodriguez-Preciado, 399 F.3d 1118, 1126 (9th Cir.
18 2005).

19       Undersheriff Barrett testified that Defendant was cooperative. In fact, before
20 agreeing to the search of his car, Defendant showed Undersheriff Barrett the contents of
21 the cooler, books on bombs and poison. Defendant explained that he kept the books in a
22 cooler in plastic bags to prevent water damage from flooding in his apartment. [Dkt. 66, pp.
23 79-81]. In the recording made by Deputy Dollison, which was played during the hearing,
24 Defendant told the officers during the search- more than once- that there was nothing
25 illegal in his car, indicating he consented to the search because he did not fear a negative
26 result from the search. Defendant thanked Undersheriff Barrett when the search was over.
27 [Dkt. 66, p. 99].

28

1    Before the search, Undersheriff Barrett had returned Defendant's license and

2    paperwork and "told him he was free to go and... to have a safe evening." [Dkt. 61, p. 77].

3    After walking to the rear of the car, Undersheriff Barrett returned to the driver's window

4    "and asked [Defendant] if I could ask him a couple more questions." [Dkt. 61, p. 79].

5    Defendant argues that Undersheriff Barrett thereby "prevented [Defendant] from leaving."

6    [Dkt. 19, p. 2]. To the contrary, Undersheriff Barrett testified that Defendant was free to

7    refuse to answer further questions and to leave the scene. [Dkt. 66, p. 78]. Under cross

8    examination, Undersheriff Barrett testified that some motorists "when you reapproach and

9    say, 'can I ask you some questions,' they say, 'no, I have to leave,' and they'll put it in gear

10   and drive away." [Dkt. 66, p. 78]. Undersheriff Barrett's weapon was holstered during his

11   stop of Defendant [dkt. 66, pp. 70, 83] and he did not otherwise exert any pressure or force

12   to keep Defendant at the scene. Defendant, therefore, was not in custody and did not need

13   to be given his <u>Miranda</u> warnings. <u>See</u> <u>Perez</u>, 37 F.3d at 510 (in finding consent to search

14   voluntarily given, Court noted that  "[t]he officers did not give a <u>Miranda</u> warning, but it

15   was not required, since [defendant] was not under arrest"); <u>see also</u> <u>United States v. Perez-</u>

16   <u>Lopez</u>, 348 F.3d 839, 847 (9th Cir. 2003) (lack of <u>Miranda</u> warnings not determinative of

17   whether consent to search was given voluntarily). Defendant was not told that a search

18   warrant could be obtained or that he could refuse to consent, but Undersheriff Barrett

19   testified- without rebuttal- that he would have stopped searching the car had Defendant

20   so instructed him. [Dkt. 66, pp. 119-20]. In these circumstances, Defendant's consent to

21   search his car was voluntarily given.

22       The weapons, books, chemicals and other items in the car were used to obtain a

23   search warrant for Defendant's house in Wisconsin. Defendant's only challenge to the

24   search of his house in Wisconsin is that the search warrant was based on evidence found

25   in Defendant's car by Undersheriff Barrett. Having determined that the search of the car

26   was proper, no reason has been presented to conclude the search of the Wisconsin house

27

28

1   was improper. During the search of the Wisconsin house on July 12, 2005, Defendant

2   consented to the search of his apartment in Phoenix. [Dkt. 61, p. 164].

3       **B.    Withdrawal of Consent to Search the Phoenix Apartment**

4       Defendant argues that he withdrew his consent before his Phoenix apartment was

5   first searched on July 13, 2005. Consent to search may be withdrawn if "an intent to

6   withdraw consent [is] made by unequivocal act or statement." United States v. Sanders,

7   424 F.3d 768, 774 (8th Cir. 2005). Defendant claims he made two statements to withdraw his

8   consent to the search of his Phoenix apartment.

9       While the July 12, 2005 search of the Wisconsin house was ongoing, Deputy

10  Petreikis and Lieutenant Peske transported Defendant from the house to the Vilas County

11  Jail, approximately a 45 minute drive. Deputy Petreikis testified that during the drive

12  Defendant "stated that he wished he would have withdrawn his permission." [Dkt. 61, p.

13  14]. Deputy Petreikis further testified he "had no idea" what Defendant was talking about.

14  Deputy Petreikis knew the search of the Wisconsin house was pursuant to a search

15  warrant, not Defendant's consent and did not know Defendant had a residence in Phoenix.

16  [Dkt. 61, pp. 14-15]. Deputy Petreikis told Defendant that "I would bring [Defendant's

17  statement] up with my immediate supervisor [Lieutenant Peske] at the jail once we got

18  there." [Dkt. 61, p. 14].

19      They arrived at the jail between 9:15 and 9:30 p.m. [Dkt. 61, p. 52]. Defendant told

20  Lieutenant Peske "I think I would like to withdraw my permission to search my place." [Dkt.

21  61, p. 43]. Lieutenant Peske responded, saying "that is okay, but we do not need your

22  permission as we have a search warrant." [Dkt. 61, p. 43]. Lieutenant Peske testified that

23  Defendant did not indicate he was referring to the consent he gave for a search of his

24  Phoenix apartment. [Dkt. 61, p. 43]. Nor was Lieutenant Peske aware that Defendant had a

25  residence other than the Wisconsin house. [Dkt. 61, p. 45].

26      Given that the search of the Wisconsin house was ongoing when Defendant made

27  his statements and the officers were not aware Defendant had another residence, the

28

1   officers reasonably took his statements to refer to the search of the Wisconsin house.
2   Defendant did not dispel the officers' confusion by informing them he was referring to the
3   consent he gave to allow the search of his Phoenix apartment. In these circumstances,
4   Defendant did not express an unequivocal intention to withdraw his consent to search his
5   Phoenix apartment.

6        Assuming *arguendo* that Defendant's statements were clear expressions of his
7   intent to revoke his consent, the officers searching the Phoenix apartment were not aware
8   of the statements until after the first search was complete. At approximately 8:00 a.m. or
9   9:00 a.m. the morning after taking Defendant to the jail, Lieutenant Peske reported
10  Defendant's statement to Agent Pevytoe. [Dkt. 66, p. 47]. Later that morning between 11:00
11  a.m. and noon, Agent Pevytoe and Lieutenant Peske reported the statements to ATF
12  Agent Salerno. [Dkt. 61, p. 48]. Agent Salerno testified that he "immediately called Special
13  Agent Tristan Moreland and told him that we might possibly have consent that was
14  withdrawn." [Dkt. 61, p. 168]. When Agent Salerno informed Agent Moreland of
15  Defendant's statement Agent Moreland had already conducted the first search of the
16  Phoenix residence. [Dkt. 61, p. 190]. The officers searching the Phoenix apartment were
17  acting in good faith based on Defendant's consent. See United States v. Bowden, 380 F.3d
18  266, 271 (6th Cir. 2004) (where it would have been difficult for an officer to know of
19  revocation, evidence was properly seized based on good faith belief in consent to search),
20  vacated 544 U.S. 925, 125 S. Ct. 1615 (2005) (for reconsideration of sentence), reinstated 408
21  F.3d 847 (6th Cir. 2005).

22       The officers searching the Phoenix apartment interrupted the search once they
23  found the castor beans. Before resuming the search, they obtained a search warrant.
24  Defendant challenges the search warrant as being based on evidence discovered during
25  the first search of the Phoenix apartment. The Court found that the search of the Phoenix
26  apartment was proper. In any event, the Magistrate Judge who signed the search warrant
27  was informed of Defendant's statements regarding his consent to search. [Dkt. 62, p. 207].
28

1   The second search of the Phoenix apartment was not based on a search warrant premised

2   on an illegal search.

3          Defendant challenges the November 8, 2005 search because it is the result of the

4   prior searches. Having determined that the prior searches were proper, the Court has no

5   reason to exclude evidence found during the November 8, 2005 search.

6   **Motion to Sever Counts**

7          Defendant was charged with three counts: (1) possession of an unregistered

8   silencer, (2) possession of an unregistered destructive device, and (3) knowingly

9   attempting to produce ricin for use as a weapon. Defendant moves to sever trial of Counts

10  One and Two from trial of Count Three.

11         Counts may be joined "if the offenses charged... are of the same or similar character,

12  or are based on the same act or transaction, or are connected with or constitute parts of a

13  common scheme or plan." Fed. R. Crim. P. 8(a). The Ninth Circuit has found that a "logical

14  relationship" between the offenses satisfies Rule 8. United States v. Sarkisian, 197 F.3d 966,

15  975-76 (9th Cir. 1999) (interpreting Rule 8(b) which contains substantive language similar

16  to that used in 8(a)). If the joinder of counts "appears to prejudice a defendant… the court

17  may order separate trials of counts." Fed. R. Crim. P. 14(a).

18         Each of the counts involves possession of an object, namely a silencer, a

19  destructive device, and a poison, closely associated with the infliction of bodily harm and

20  death. Such acts of possession are acts of similar character. See United States v. Rousseau,

21  257 F.3d 925, 932 (9th Cir. 2001) (acts of possessing firearms are of same or similar

22  character). The harmful and deadly character of those items also indicates there is a

23  "logical relationship" in the possession of those items. Depending on Defendant's intent

24  in possessing those items, the "logical relationship" may be a curiosity with weapons and

25  their creation, a desire to arm oneself, in the manner of the so-called "survivalists," or even

26  an intent to use the weapons to harm or terrorize. The nature of that relationship is a matter

27  for trial.

28

1    The nature of that logical relationship is relevant to each count with which
2  Defendant is charged because each count requires proof of Defendant's intent. The
3  statutory definition of a silencer includes "any combination of parts... intended for use in
4  assembling or fabricating a firearm silencer," 18 U.S.C. § 921(a)(24); the definition of a
5  destructive device includes "any combination of parts either designed or intended for use
6  in converting any device into a destructive device," 26 U.S.C. § 5845(f)(3); the third count
7  includes the intentional development or possession of "any biological agent... for use as
8  a weapon," 18 U.S.C. § 175(a).

9    Given the relationship between the weapons and the need to prove Defendant's
10  intent in possessing each of the weapons, "evidence relating to each... count[] would have
11  been admissible in a separate trial on the other... counts to show intent, lack of mistake,
12  etc." pursuant to Fed. R. Evid. 404(b). United States v. Evans, 796 F.2d 264, 265 (9th Cir.
13  1986). For example, in determining whether Defendant possessed castor beans with the
14  intent to use them as a weapon, as charged in Count Three, evidence that Defendant made
15  other weapons, such as silencers and bombs, would make it more likely that Defendant
16  possessed the castor beans with the intent to use them as a weapon. This would not be
17  an unfair inference to draw because of the need to prove Defendant's intent.

18    Because the charged acts are of a similar nature, bear a logical relationship to one
19  another, and would be admissible in each trial if tried separately, their joinder in a single
20  trial is proper.

21    Accordingly,

22    **IT IS ORDERED** that Defendant's Motion to Suppress Evidence [dkt. 19] is
23  **DENIED**.

24  //
25  //
26  //
27  //
28

1    **IT IS FURTHER ORDERED** that Defendant's Motion to Sever Counts [dkt. 37] is

2    **DENIED**.

3    DATED this 26th day of May, 2006.

4

5

6    Earl H. Carroll
     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 11 -